Jacob Blaustein et al., as Executors of Louis Blaustein, Deceased, et al., Suing on Behalf of Themselves and All Stockholders of Pan American Petroleum & Transport Company Similarly Situated, Appellants, and Fred C. Haas et al., Interveners, Plaintiffs, *v.* Pan American Petroleum & Transport Company et al., Defendants, and Standard Oil Company (Indiana) et al., Defendants-Respondents.

Argued May 25, 1943; decided July 19, 1944.

*Allen T. Klots, Nathan L. Miller, James W. Husted, George G. Reynolds, Peter H. Kaminer* and *John R. Davison* for appellants. I. Defendants pre-empted Pan Am's backlog of crude properties while preventing Pan Am from acquiring any properties of its own. While defendants prevented Pan Am from acquiring any properties whatever, Indiana proceeded actively to acquire properties in East Texas and on the Gulf Coast with the intention of reselling the crude therein to Pan Am. Defend-

ants pre-empted for Indiana Pan Am's pipe line and crude oil purchasing operations while preventing Pan Am from building its own pipe line and organizing its own crude oil purchasing department. Defendants' conduct resulted in large profits to Indiana and great damage to Pan Am. Indiana dominated Pan Am to prevent its integration and profited thereby. Defendants violated their duties to Pan Am and must account. (*Everett v. Phillips*, 288 N. Y. 227; *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N. Y. 185; *Pepper v. Litton*, 308 U. S. 295; *Munson v. S. G. & C. R. R. Co. et al.*, 103 N. Y. 58; *Pink v. Title Guarantee & Trust Co.*, 274 N. Y. 167; *N. Y. Trust Co. v. American Realty Co.*, 244 N. Y. 209; *Dutton v. Willner*, 52 N. Y. 312; *Knox v. Mackinnon*, 13 App. Cas. 763; *Southern Pacific Co. v. Bogert*, 250 U. S. 483; *Singer v. Carlisle*, 26 N. Y. S. 2d 172; *Sage v. Culver*, 147 N. Y. 241; *Geddes v. Anaconda Mining Co.*, 254 U. S. 590.) II. The Appellate Division was in error when it found that the defendants acted in good faith. (*Southern Pacific Co. v. Bogert*, 250 U. S. 483; *Pink v. Title Guarantee & Trust Co.*, 274 N. Y. 167; *Meinhard v. Salmon*, 249 N. Y. 458; *Wendt v. Fischer*, 243 N. Y. 439.) III. Indiana's subsidiaries are not necessary parties to this action. (*Sheldon v. Metro-Goldwyn Corp.*, 106 F. 2d 45, 309 U. S. 390; *Jackson v. Smith*, 254 U. S. 586; *Rapid T. Subway Constr. Co. v. City of N. Y.*, 259 N. Y. 472; *Berkey v. Third Avenue Railway Co.*, 244 N. Y. 84; *Pepper v. Litton*, 308 U. S. 295.)

*Ralph S. Harris, Richard E. Dwight, John R. McCullough, Frederick W. P. Lorenzen* and *Leo L. Laskoff* for Standard Oil Company (Indiana), respondent. I. This being an appeal from a final judgment reversing on new findings an interlocutory judgment, the jurisdiction of the Court of Appeals is limited to a "review of questions of law". (N. Y. Const. art. VI, § 7; Civ. Prac. Act, § 605, as amd. L. 1942, ch. 297; *Sommer & Bro., Inc., v. Lorsch & Co., Inc.*, 254 N. Y. 146; *Newell v. People*, 7 N. Y. 9; *Nat. Cash Register Co. v. Remington A. Co., Inc.*, 242 N. Y. 99; *Fendler v. Morasco*, 244 N. Y. 604; N. Y. State Bar Association Reports, vol. XLV [1922], p. 318; The Judicial Council, 6th Annual Report & Studies [1940], p. 172; The Judicial Council, 7th Annual Report & Studies [1941], pp. 562, 564.) II. The Appellate Division was

correct in concluding that Indiana was not a fiduciary for Pan Am in the conduct of the latter's business. (*Brunkenfeld et al.* v. *New York Railways Corporation et al.* 82 F. 2d 739, 298 U. S. 687; *Ruppert* v. *Brooklyn Heights R. R. Co.*, 154 N. Y. 90; *Bell* v. *Fred T. Ley & Co., Inc.*, 278 Mass. 60; *Neff* v. *Farmers' Loan & Trust Co.*, 96 N. Y. L. J., 1113, 254 App. Div. 660, 279 N. Y. 661; *Continental Ins. Co.* v. *N. Y. & H. R. R. Co.*, 187 N. Y. 225; *Miller* v. *Vanderlip*, 285 N. Y. 116; *Stott Realty Co.* v. *Orloff*, 262 Mich. 375; *Cleary* v. *Higley,* 154 Misc. 158, 246 App. Div. 698, 270 N. Y. 673; *Kentucky Electric Power Co.* v. *Norton Coal Mining Co.*, 93 F. 2d 923; *Magruder* v. *Drury*, 235 U. S. 106.) III. The Appellate Division correctly concluded that Indiana usurped no corporate opportunities belonging to Pan Am. (*Hauben* v. *Morris,* 255 App. Div. 35, 281 N. Y. 652; *Burland* v. *Earle* [1902], A. C. 83; *Colorado Co.* v. *Harris,* 97 Col. 309; *N. Y. Trust Co.* v. *American Realty Co.*, 244 N. Y. 209; *Lagarde* v. *Anniston Lime & Stone Co.*, 126 Ala. 496; *Lincoln Stores, Inc.,* v. *Grant,* 309 Mass. 417; *Greer* v. *Stannard,* 85 Mont. 78; *Lawrence* v. *Sutton-Zwolle Oil Co.*, 193 La. 117; *Omar Oil & Gas Co.* v. *Blair Oil Co.*, 285 F. 588; *Davis* v. *United States Electric Power & Light Co.*, 77 Md. 35.) IV. Plaintiffs, as minority stockholders, are not entitled to any relief addressed to the intercompany pipeline and crude purchase contracts. (*Cleary* v. *Higley,* 154 Misc. 158, 246 App. Div. 698, 270 N. Y. 673; *Everett* v. *Phillips,* 288 N. Y. 227; *Moriarty* v. *Butler Grocery Co.*, 261 App. Div. 20, 286 N. Y. 687; *Musson* v. *New York & Queens El. L. & P. Co.*, 138 Misc. 881; *Bell* v. *Fred T. Ley & Co.*, 278 Mass. 60; *Gamble* v. *Q. C. W. Co.*, 123 N. Y. 91; *N. Y. Trust Co.* v. *American Realty Co.*, 244 N. Y. 209; *Hauben* v. *Morris,* 255 App. Div. 35, 281 N. Y. 652; *Hine* v. *Lausterer,* 135 Misc. 397, 232 App. Div. 719, 257 N. Y. 523; *Barr et al.* v. *N. Y., L. E. & W. R. R. Co. et al.*, 125 N. Y. 263; *Globe Woolen Co.* v. *Utica G. & El. Co.*, 170 App. Div. 940, 224 N. Y. 483; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Burden* v. *Burden,* 8 App. Div. 160, 159 N. Y. 287.) V. Neither the definitive agreement nor the plan of reorganization deprived the directors of Pan Am of the right and duty to exercise their independent judgment in the management of Pan Am. The purposes of the definitive agreement and the plan have, however, been substantially carried out. (*Manson* v.

*Curtis,* 223 N. Y. 313; *Pollitz* v. *Wabash R. R. Co.,* 207 N. Y. 113; *McQuade* v. *Stoneham,* 263 N. Y. 323; *Dubbs* v. *Kramer,* 302 Penn. St. 455; *Clifford* v. *Firemen's Mut. Benevolent Assn.,* 232 App. Div. 260, 259 N. Y. 547; *Carney* v. *N. Y. Life Ins. Co.,* 162 N. Y. 453.) VI. The findings of the Appellate Division are supported by the overwhelming weight of the evidence. (*Neff* v. *Farmers' Loan & Trust Co.,* 254 App. Div. 660, 279 N. Y. 661; *Benson* v. *Associated Art Press, Inc.,* 236 App. Div. 645; *Gamble* v. *Q. C. W. Co.,* 123 N. Y. 91; *City Bank F. T. Co.* v. *Hewitt Realty Co.,* 257 N. Y. 62; *Armstrong* v. *Hayden,* 126 Misc. 786; *Heinemann et al.* v. *Heard et al.,* 62 N. Y. 448; *F. L. & T. Co.* v. *Siefke,* 144 N. Y. 354; *Moriarty* v. *Butler Grocery Co.,* 261 App. Div. 20, 286 N. Y. 687; *Gallin* v. *National City Bank of New York,* 152 Misc. 679; *Stoddard* v. *Schwab,* 255 App. Div. 556, 281 N. Y. 586; *Bown* v. *Ramsdell,* 139 Misc. 360; *Karasik* v. *Pacific Eastern Corporation,* 180 Atl. 604; *Knox* v. *Mackinnon,* 13 App. Cas. 753; *Texas & Pacific Coal Co.* v. *Lawson,* 89 Tex. 394; *Comer* v. *Burton-Lingo Co.,* 24 Tex. Civ. App. 251; *Houck & Dieter* v. *Brewing Association,* 88 Tex. 184; *Waters-Pierce Oil Co.* v. *Texas (No. 1),* 48 Tex. Civ. App. 162, 212 U. S. 86; *Continental Ins. Co.* v. *N. Y. & H. R. R. Co.,* 187 N. Y. 225.) VII. SO&G, SPL and SCOP are necessary parties. Pan Refining and Pan Production are necessary parties. (*Holmes* v. *Camp,* 227 N. Y. 635; *Brock* v. *Poor,* 216 N. Y. 387; *Kavanaugh* v. *Commonwealth Trust Co.,* 181 N. Y. 121; *Niles* v. *N. Y. C. & H. R. R. R. Co.,* 35 Misc. 69, 69 App. Div. 144, 176 N. Y. 119; *Security Trust Co.* v. *Pritchard,* 201 App. Div. 142; *Holmes* v. *Camp,* 180 App. Div. 409; *Seagrist* v. *Reid,* 171 App. Div. 755; *Gardiner* v. *Pollard,* 10 Bosw. 674; *Druckermann* v. *Harbord,* 174 Misc. 1077.)

*J. Howard Carter, George T. Townley, Stuart N. Updike, James E. Denning* and *John R. Schoemer, Jr.,* for Edward G. Seubert and others, respondents. I. The fairness and reasonableness of the purchasing and pipe line contracts required judgment for the directors on those issues. (*Cleary* v. *Higley,* 154 Misc. 158, 246 App. Div. 698, 270 N. Y. 673; *Musson* v. *New York & Queens El. L. & P. Co.,* 138 Misc. 881; *Hart* v. *Ogdensburg & L. C. R. R. Co.,* 89 Hun 316; *Omar Oil & Gas Co.* v. *Bair Oil Co.,* 285 F. 588; *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587.) II. The "corporate opportunity" doctrine was inapplicable.

(*Seymour* v. *S. F. C. Assn. et al.*, 144 N. Y. 333; *Blake* v. *Buffalo Creek R. R. Co.*, 56 N. Y. 485; *Michigan Crown Fender Co.* v. *Welch*, 211 Mich. 148; *Colorado & Utah Coal Co.* v. *Harris*, 97 Col. 309; *Pioneer Oil & Gas Co.* v. *Anderson*, 168 Miss. 334; *Lagarde* v. *Anniston Lime & Stone Co.*, 126 Ala. 496.) III. The trial court's theory of the directors' liability was unsound. (*Cleary* v. *Higley*, 154 Misc. 158, 246 App. Div. 698, 270 N. Y. 673; *Carr* v. *Kimball*, 153 App. Div. 825, 215 N. Y. 634; *Hun* v. *Cary et al.*, 82 N. Y. 65; *Rous* v. *Carlisle*, 261 App. Div. 432; *Briggs* v. *Spaulding*, 141 U. S. 132.) IV. The directors should not have had the burden of proof prescribed by the Trial Court. (*Stoddard* v. *Schwab*, 255 App. Div. 556, 281 N. Y. 586; ·*Bown* v. *Ramsdell*, 139 Misc. 360; *Ludlam* v. *Riverhead Bond & Mortgage Corp.*, 244 App. Div. 113; *Gallin* v. *National City Bank of New York*, 152 Misc. 679; *Rathbone* v. *Ayer*, 196 N. Y. 503; *Beveridge* v. *N. Y. E. R. Co.*, 112 N. Y. 1; *Matter of Watertown Gas Light Co.*, 127 App. Div. 462; *Anderson* v. *Bean*, 272 Mass. 432.) V. The Court of Appeals has the power to review the facts upon this appeal. (Report of Judiciary Constitutional Convention. N. Y. Legislative Documents [1922], vol. 14, No. 37, p. 19; *York Mortgage Corp.* v. *Clotar Const. Corp.*, 254 N. Y. 128; *Matter of Baker*, 286 N. Y. 666; *Everett* v. *Phillips*, 288 N. Y. 227; *United Paper Board Co.* v. *Iroquois P. & P. Co.*, 217 App. Div. 253; *Maggi* v. *Sabatini*, 250 N. Y. 296; *Hartol Products Corp.* v. *Prudential Insurance Co.*, 290 N. Y. 44.)

LEWIS, J. This is a stockholders derivative action. It was instituted by Louis Blaustein and his son Jacob Blaustein who, at the commencement of the action, were not only substantial minority stockholders of Pan American Petroleum and Transport Company — to which reference will be made as "Pan Am" — but also were directors and respectively its president and executive vice-president. The subsequent death of Louis Blaustein led to the substitution of his executors as plaintiffs. Other plaintiffs in the action and the interveners, Haas and Barry, are also minority stockholders of Pan Am.

The defendant Standard Oil Company (Indiana) — hereinafter referred to as "Indiana" — is a foreign corporation which at the time of the trial owned approximately 78% of the outstanding stock of Pan Am. The defendants Jackson and

Bullock were not served with process. Of the remaining individual defendants Seubert is a director and chairman of the Board of Directors of Pan Am and is president and a director of Indiana; Barkdull is a director of Pan Am and is executive vice-president and a director of Indiana; Stephens is a director of Pan Am and a director and general counsel of Indiana; Wilson, McKeever and Carroll, Jr., are directors and respectively the president, vice-president and treasurer of Pan Am. The defendant Teagle was not a director of Pan Am but was the president of the defendant Standard Oil Company (N. J.) when the present action was instituted.

The complaint sets forth three causes of action. In the first cause of action it is alleged in substance that, as the majority stockholder, Indiana exercised a dominating influence over Pan Am and caused the defendant directors to breach duties alleged to be fiduciary by failing to cause Pan Am to carry out the terms of a " definitive agreement," presently to be described, which " reinforced, defined and emphasized " the duty of Indiana and the defendant directors to conduct the business of Pan Am in good faith and in the sole interest of Pan Am and its body of stockholders; that in violation of such duty the defendant directors and Indiana, with the knowledge and connivance of the defendant Teagle and the defendants Standard Oil Company (N. J.) and Standard Oil Company of N. J. (Del.), in bad faith had fraudulently and intentionally wasted the assets, profits and business opportunities available to Pan Am, diverted the same to the uses of the corporate defendants Indiana and its affiliate Standard Oil Company (N. J.) and have conducted the business of Pan Am contrary to its best interests with the purpose of suppressing competition which otherwise would have been practiced by Pan Am against these corporate defendants. The second cause of action alleges that the acts of the defendants set forth in the first cause of action were done pursuant to a conspiracy. The third cause of action, under sections 60 and 61 of the General Corporation Law, is by Louis Blaustein and Jacob Blaustein as directors and officers of Pan Am and for its benefit against the individual defendants who were officers and directors of Pan Am. The plaintiffs demand that an accounting be had of all assets and profits of Pan Am alleged to have been illegally

paid out, wasted or diverted by the acts of the defendants; that a constructive trust be impressed upon moneys, oil leases or property acquired by the defendants as the result of acts committed in bad faith and in breach of the alleged fiduciary obligations owed to Pan Am and that injunctive relief of a specified character be granted.

Upon this appeal we review a judgment entered upon an order of the Appellate Division which reversed on the facts and law an interlocutory judgment in favor of the plaintiffs entered at Special Term and dismissed the complaint on the merits.

Before reference is made to the judgment now before us for review a preliminary statement of the factual background of this controversy may serve to make clear the points upon which the decision at Special Term and the decision at the Appellate Division diverge:

The decedent Louis Blaustein and his son Jacob Blaustein were pioneers in the marketing of petroleum products. In 1910 they were distributing kerosene to customers in Baltimore by a single horse-drawn tank wagon. During the ensuing thirteen years, by skillful marketing methods, including the installation of " visible " gasoline pumps and the production of " Amoco ", a premium gasoline designed to reduce motor " knock," they extended their sale of petroleum products into large areas in the eastern seaboard States. In 1922, when the Blausteins incorporated their business into two corporations of which they were the sole owners — Lord Baltimore Filling Stations, Inc., and The American Oil Company — their gross annual receipts had increased to approximately $4,000,000. However, they found further progress retarded by the fact that they had no crude oil properties, no pipe lines and no refinery. Their gasoline and other products were purchased from competitors. At that time Pan Am, then an independent company, owned in abundance in foreign countries and in the United States the crude oil reserves and oil producing facilities which the Blausteins lacked. It was in those circumstances that in 1923 the Blausteins sold to Pan Am a one-half interest in the stock of The American Oil Company and in Lord Baltimore Filling Stations, Inc. At the same time The American Oil Company entered into a contract with Mexican Petroleum Company, a

Pan Am subsidiary, to supply until December 31, 1933, the entire gasoline requirements of The American Oil Company and Lord Baltimore Filling Stations, Inc., at a price of 5¼ cents per gallon " under the prevailing tank-wagon market price " in Baltimore, Norfolk and Philadelphia at the time of delivery. The performance of this contract — which is known in the record as the " umbrella " contract — was guaranteed by Pan Am. Then followed a period of wide expansion in the business of The American Oil Company. Profits rose from $353,-017 in 1923 to $4,149,200 in 1932, in which latter year the surplus had increased to a figure in excess of $18,000,000 after payment of dividends ranging from 8% in 1927 to 100% in 1932. In the meantime, between 1927 and 1930, Indiana had acquired 96% of the stock of Pan Am. Toward the end of that period the management of Pan Am became concerned by an agitation in Congress which in 1932 led to the imposition of a tariff on the importation of petroleum products and had the effect of seriously curtailing such importation. We are told by the defendants that it was the threat of a high tariff on the importation of petroleum products which caused Pan Am in 1932 to sell its foreign crude oil reserves and oil producing facilities to the defendant Standard Oil Company (N. J.). The plaintiffs assert that the sale by Pan Am to Standard Oil Company (N. J.) of its foreign properties was prompted by a desire by Indiana to stifle competition by Pan Am. In any event, it was in connection with that sale and because of the prospect that a high tariff would prevent Pan Am from receiving from foreign sources a supply of crude oil sufficient to meet the demands of its domestic market, that an arrangement was made by which the defendant Standard Oil Company (N. J.) would supply sufficient refined petroleum products to enable Pan Am to meet its engagement under the " umbrella " contract of 1923 with The American Oil Company until that contract should expire on December 31, 1933.

It is important to note that although the Blausteins and Pan Am since 1923 had each owned one half of the stock of The American Oil Company and Lord Baltimore Filling Stations, Inc., the Blausteins did not become stockholders of Pan Am until April 1932 — at about the time when Pan Am sold its foreign properties. They then purchased a few hundred shares

of Pan Am stock — their purpose being, according to Jacob Blaustein, to put themselves in a legal position to state their attitude toward the sale by Pan Am of its foreign properties. The Blausteins were concerned as to the source from which The American Oil Company could secure its supply of gasoline after the ten year "umbrella" contract should come to an end on December 31, 1933. That problem led to correspondence, conferences and a tentative agreement between the Blausteins and officers of Pan Am and Indiana looking to the reorganization of Pan Am and The American Oil Company. Finally, in December, 1932, a contract known in the record as the "Definitive Agreement" was entered into between the Blausteins and The American Oil Company, Lord Baltimore Filling Stations, Inc., Pan Am and Indiana, the purpose of which was " * * * to effect a reorganization of Pan-Am (including subsidiaries), American and Lord Baltimore, to form a complete cycle and unit in the oil business which will acquire property and produce therefrom its own sufficient reserves of crude oil and raw products, refine and manufacture same into gasoline and other derivatives and combinations and, within the limits of continental United States, market the various products."

The agreement provided in part that Pan Am was to acquire the Blaustein stock in The American Oil Company, which company in turn was to acquire all the stock of Lord Baltimore Filling Stations, Inc., and in payment therefor Pan Am agreed to issue to the Blausteins 1,286,876 shares of its own stock. Pan Am was to provide on or before February 10, 1934, a refining capacity of 40,000 or 48,000 barrels of crude oil per calendar day — "provided such date of completion is reasonably possible." It was further agreed that "Pan-Am shall actively proceed to secure its own sufficient crude oil production as a reserve for the requirements of Pan-Am and for such purpose shall immediately allocate an initial sum of $3,000,000 to be expended under the supervision of the Board of Directors for the acquisition of crude oil producing properties." Until Pan Am should accumulate a sufficient reserve for its requirements it was given the option to require Indiana to supply "to the extent of its ability and without loss to itself" all or any part of the deficiency in crude oil requirements necessary for Pan Am's requirements at average prevailing field prices. The

agreement made provision for the election of Louis Blaustein and Jacob Blaustein respectively as president and executive vice-president of Pan Am and respectively as chairman of the Board of Directors and president of The American Oil Company. The defendant Seubert, president of Indiana, was to be elected chairman of the Board of Directors of Pan Am; the defendant McKeever, then the president of Pan Am, was to be elected vice-chairman of its Board of Directors. The Blausteins were given the right, while they owned 50% of the stock of Pan Am issued to them under the agreement, to name three of the nine directors who constituted the Board of Directors of Pan Am and, for a period of four years, were given charge of the marketing activities of the companies, subject, however, to conditions presently to be stated. Then followed provisions which relate themselves peculiarly to the present controversy: " (d) It is the intention of the parties hereto that the Blausteins and their survivor (in addition to their other Pan-Am activities) shall have the active management and control of all marketing activities of Pan-Am and all subsidiaries, and that such management and control shall be interfered with only by and through the Board or Boards of Directors of Pan-Am or its subsidiaries, but said Boards shall have the right at all times to fully control the business of the company and to reverse any decision of the Blausteins whether upon marketing operations or otherwise."

In the event disagreement should arise between the Blausteins and a majority of the Board of Directors of Pan Am the Blausteins were given the right to terminate their managing contract and to require Indiana to purchase their stock in Pan Am under a stock option provision within the agreement which permitted the Blausteins during the ensuing four years to sell all or any part of their Pan Am stock to Indiana at its book value at the time of sale, plus $1.00 per share but in no event at less than $13.25 a share. Many of the provisions of the Definitive Agreement became part of the " Plan of Organization " which was approved by Pan Am stockholders on March 27, 1933. On the following day, March 28, 1933, consummation of the agreement and plan occurred in part — including the contemplated stock transfers, the election of the

three Blaustein nominees — including Louis Blaustein and Jacob Blaustein — to the Board of Directors of Pan Am and the election of those two nominees respectively as president and vice-president of the corporation.

We are thus brought to the time in March, 1933 — a critical period in the financial and economic history of the nation — when the officers and Board of Directors of Pan Am were called upon to determine problems of business management involving future commitments by the corporation and its future business policy. Those questions of policy at once became controversial matters between the Blausteins and other members of the Board of Directors of Pan Am and led ultimately to the present action. The Blausteins then asserted and have since contended that under the Definitive Agreement it was the duty of the directors of Pan Am to proceed at once to make Pan Am an integrated company — a company equipped to conduct those operations necessary to produce and market petroleum products from crude petroleum as found in the earth to the sale of the finished product. In other words, to borrow language found in the Definitive Agreement and in the Plan of Reorganization — " to form a complete cycle and unit in the oil business."

Since 1933 it has been contended by the Blausteins and has been asserted by the plaintiffs in this action as constituting actionable wrongs, that instead of building in that year a refinery with a daily capacity of 40,000 or 48,000 barrels to meet the requirements of the market supplied by Pan Am, the defendant directors caused to be built a refinery of one half the size mentioned in the Definitive Agreement and gave a profitable three-year processing contract for the balance to Humble Oil & Refining Company, a subsidiary of the defendant Standard Oil Company (N. J.). As to this charge it was the ruling at Special Term — not reversed by the Appellate Division — that it was for the defendant directors to decide whether it would be better to conserve their capital funds over the period of the processing contract rather than invest in a second refinery unit; that in the exercise of their own judgment they were warranted in making these capital refinery expenditures gradually. The Blausteins have also asserted and the plaintiffs now

complain that instead of proceeding actively in 1933 to secure sufficient crude oil properties to supply the market requirements of Pan Am, that corporation was. not permitted by its Board of Directors to purchase crude oil properties in Texas, Louisiana or elsewhere until the latter part of 1935 during which interval the defendant Indiana, through its subsidiary Stanolind Oil & Gas Company acquired crude oil properties needed by Pan Am in the East Texas field and thereafter sold to Pan Am, at a profit, the crude oil taken from properties thus acquired; that instead of permitting Pan Am to construct its own pipe line from the East Texas field to its refinery at a substantial saving a year, Indiana and the defendant directors required Pan Am to transport its crude oil by an indirect route which utilized a pipe line of Indiana's subsidiary, Stanolind Pipe Line Company; that instead of permitting Pan Am to organize its own crude oil purchasing department for the purpose of gaining a supply of crude oil to meet the requirements of Pan Am's projected refinery, the defendant directors arranged to have these purchasing activities carried on by Stanolind Crude Oil Purchasing Company which is a subsidiary of Indiana.

It is the position of the defendant directors that the acts mentioned above, which are charged as actionable wrongs in the plaintiffs' present suit, were the result of careful investigation and a review of factors affecting the welfare of Pan Am at a time after the " bank holiday " in 1933 when the business economy of the nation was passing through a critical period; that their acts as directors of Pan Am were in good faith, in the best interests of the corporation; that, although a slower rate of integration and business expansion for the corporation was adopted than was outlined in the Definitive Agreement, the result was that despite the risks and uncertainties, both economic and scientific, of that particular period, Pan Am passed through those depression years of 1933 and 1935 on a profitable basis; that a majority of the defendant directors determined as a matter of business judgment that the economic conditions affecting the oil industry in 1933 did not warrant the construction at that time of an oil refinery of a daily capacity of 40,000 or 48,000 barrels as provided in the

Definitive Agreement but that the best interests of Pan Am would be served by the construction of a plant capable of refining one half that capacity and that, pending the construction of additional refinery units at later dates, a contract to process the balance should be made with a reliable refinery upon satisfactory terms; that the defendant directors concluded after considering all the factors involved that it was not for the best interests of Pan Am in 1933 to make a capital expenditure estimated at more than $4,000,000 for the construction of a pipe line gathering system in the East Texas field and a trunk pipe line running directly from that field to Pan Am's projected refinery at Texas City; that the defendant directors were convinced that it was more to the advantage of Pan Am to contract for the purchase of its crude oil from an established dealer in the field than to attempt in 1933 to organize its own purchasing department and embark upon a program of attempting to purchase directly from producers; that under conditions then existing the defendant directors acted for the best interests of Pan Am when they made a favorable contract with Stanolind Crude Oil Purchasing Company, a subsidiary of Indiana, which was already operating as a major purchaser in the East Texas field, to supply Pan Am with its crude oil requirements at current market prices; that the defendant directors were reliably informed by counsel and believed that it would probably violate the anti-trust laws of the State of Texas if Pan Am, or a subsidiary to be formed for that purpose, should engage in the production of crude oil in that State in view of the fact that for many years Stanolind Oil & Gas Company, a subsidiary of Indiana, had been engaged in Texas in the same line of business; that the defendant directors were unwilling during the years 1933 and 1934 while the question was under investigation by counsel, to permit Pan Am or a production subsidiary thereof to assume the risk and penalties which would be involved by entering upon such a venture as operating in Texas two crude oil producing corporations with common stock control before the question of its legality was resolved to their satisfaction or some plan was devised to avoid the difficulty.

At Special Term, where the second cause of action, alleging conspiracy, was dismissed on the merits as against all defend-

ants and the entire complaint was dismissed on the merits against the defendant Teagle and the corporate defendants Standard Oil Company (N. J.) and Standard Oil Company of New Jersey (Del.), the Trial Justice found that there was no fraud committed by any of the defendants; that no individual defendant had made for himself a profit, secret or otherwise, from any transaction involved in the action and that there was no conspiracy between the defendant Teagle or the corporate defendants Standard Oil Company (N. J.) and Indiana to damage Pan Am for competitive reasons or any other reason. However, Special Term ruled in substance that the majority stockholder Indiana, acting through the defendant directors, had exercised in the business and affairs of Pan Am a dominating influence of such a character that Indiana and the defendant directors thereby became fiduciaries for the minority stockholders of Pan Am; that fiduciary duties so found to exist were breached by Indiana acting through the defendant directors when, in connection with transactions involving the acquisition of new crude oil properties, arrangements for crude oil production and agreements for pipe line transportation, Indiana usurped the functions of Pan Am, exploited its business opportunities and in those matters conducted the transactions in ways profitable to Indiana and detrimental to the interests of Pan Am.

The interlocutory judgment entered at Special Term directed that Indiana account to Pan Am for profits made by certain of its subsidiaries in connection with specified transactions as to which liability of certain named individual defendants was also decreed; that under specified conditions a constructive trust be impressed upon certain oil properties acquired by Indiana's subsidiary between April 1, 1933, and July 1, 1935, and used to supply crude oil to Pan Am or its subsidiaries and that by the final judgment herein such properties be transferred to Pan Am; that Indiana and certain defendant directors account for and pay to Pan Am all damages which had accrued to Pan Am from April 1, 1933, to the date of the decree in this action by reason of the failure by Pan Am to construct its own oil gathering system and a direct pipe line from the East Texas field; that Indiana account for and pay to Pan Am the benefits accruing to it by reason of a certain contract by which Indiana's

cost of transporting crude oil from the "Winkler" field was reduced. Incidental injunctive relief was also decreed.

Upon appeal by all parties except Pan Am and the corporate defendants Standard Oil Company (N. J.), Standard Oil Company of New Jersey (Del.) and the individual defendants Teagle, Jackson and Bullock, the Appellate Division affirmed the interlocutory judgment insofar as appealed from by the plaintiffs and reversed the interlocutory judgment on the facts and law, two justices dissenting, insofar as appealed from by the defendants, and dismissed the amended complaint on the merits. Certain findings of fact and conclusions of law were reversed and new findings of fact and conclusions of law were made.

The Appellate Division found that none of the defendants, in any of the transactions here attacked, had acted fraudulently, negligently or in bad faith, and that they did not profit personally thereby; that at no time had any of the defendant directors been dominated or controlled in any manner or degree by Indiana or by any officer, director or employee of Indiana; that Pan Am and its subsidiaries had at all times been managed by their respective boards of directors, each member of which; in the transactions here involved, had exercised his own honest business judgment for what, in the light of the facts and circumstances confronting him at the time of the decision, he believed to be for the best interests of the corporation for which he was then acting as a director; that at no time since March 28, 1933, or prior thereto, had Indiana usurped the function of, or influenced the action of the Board of Directors of Pan Am, or deprived minority stockholders of Pan Am of their pro rata share of Pan Am assets, or frustrated or destroyed the business of Pan Am or taken over for itself assets or business opportunities in which Pan Am had a tangible expectancy, or prevented Pan Am from obtaining assets vital to its corporate existence. As to transactions involving the purchasing, production and pipe line transportation of crude oil which are challenged by the plaintiffs as breaches of fiduciary duties by Indiana and the defendant directors and upon which rests that part of the decision at Special Term which favors the plaintiffs, the Appellate Division reached a contrary decision and made findings substantially as follows: that the defendant directors

fully informed themselves of all the possible methods of obtaining Pan Am's crude oil needs beginning January 1, 1934, and decided in good faith and in the exercise of sound business judgment, to make a contract to purchase at least a substantial part of that crude oil from an Indiana subsidiary rather than to enter upon the hazards of setting up Pan Am's own crude oil purchasing department; that it was reasonably necessary in order to obtain by January 1, 1934, a dependable flow of crude oil in the required amount of 48,000 barrels per day to make contractual arrangements therefor similar to those actually entered into, the terms of which were fair and reasonable and in the best interests of Pan Am; that after the defendant directors had fully informed themselves of the desirability of various plans for the transportation of Pan Am's crude oil requirements from the East Texas field to the Gulf Coast, they authorized the pipe line arrangement with Indiana's subsidiary; that such pipe line arrangement was found necessary because additional connections in the East Texas field could not otherwise have been secured before January 1, 1934, it being the judgment of the defendant directors, acting in good faith, that the pipe line arrangement thus adopted was necessary to secure a sufficient number of additional crude oil connections in the East Texas field to enable Pan Am to meet the daily requirements of its refineries on January 1, 1934, that the defendant directors acting upon advice of counsel and in good faith deferred until 1935 the organization of Pan Am crude oil producing subsidiary to operate in Texas, because of their honest belief that, in the circumstances, the anti-trust laws of that State made it unsafe, from a legal standpoint, for two crude oil producing corporations under common stock ownership to engage in the business of producing crude oil in Texas.

As we consider the problem thus presented it should be noted that this is not an action *ex contractu* to enforce the Definitive Agreement. That contract was received in evidence and was treated by the Trial Justice as " * * * a general statement, approved by Indiana and most of the defendants, and subscribed by Indiana and by others, as to what were the best interests of, and policies for, Pan Am, as of February 17, 1933, the date of its execution." We agree with his conclusion that " Such a statement * * * does not mean that the plan

of the agreement had to be followed to the letter, in so far as legal rights and duties in this stockholder's action are concerned. Nor does it mean that it could not be deviated from in the future, should conditions change." And if, for example, we take the action by the defendant directors in building a 24,000 barrel refinery instead of one having a daily capacity of 48,000 barrels, we also agree with the statement by the Justice at Special Term that " * * * even though the signatories to the definitive agreement may have thought, on February 17th, that the full-sized refinery should have been built and agreed to have it built, and even though steps were taken on March 8th to progress the project, there is no reason why the directors who were chargeable with the management of the affairs of the corporation could not change their minds and alter the policy of the company in the light of the continuing economic depression, when the time came for making the final decision as to the construction of the refinery. It was their job, as directors, to use their best judgment irrespective of the definitive agreement, and, in the absence of a showing of bad faith, the presumption is that their judgment was honestly exercised. If this were a contract action based on the definitive agreement alone, such considerations as economic conditions would be immaterial. But in this stockholders action, the test is solely the bona fide judgment of the directors; and the surrounding business conditions are most important."

In this opinion we shall refer to items in the interlocutory judgment as to which we think Special Term erroneously concluded that the rule last quoted above was not applicable.

The interlocutory judgment decrees that Indiana account to Pan Am for all oil properties, "producing or otherwise," acquired between April 1, 1933, and July 1, 1935, by Stanolind Oil & Gas Company (hereinafter referred to as "SO&G") within certain designated areas in Texas, and for the profits made by SO&G on all crude oil produced from those properties and sold to Pan Am or its subsidiaries from April 1, 1933, to the date of final judgment herein; and that Indiana, as a constructive trustee of the designated oil properties acquired by SO&G between April 1, 1933, and July 1, 1935, be directed by the final judgment herein to cause those properties to be transferred to Pan Am under certain stated conditions.

As a basis for that adjudication Special Term held that Indiana, as majority stockholder of Pan Am, so dominated its corporate affairs as to become a fiduciary for the minority; that Indiana and the defendant directors were responsible for a delay from April 1, 1933, to July 1, 1935, in organizing a producing subsidiary in Texas as a means of furnishing Pan Am with its crude oil requirements. The court ruled further that during that period of delay Indiana, acting through the defendant directors purchased crude oil properties in Texas, from which oil was later sold to Pan Am at a profit, thereby violating its fiduciary obligations by usurping profitable corporate or business opportunities which rightly belonged to Pan Am.

We find no substantial evidence which sustains that adjudication. The cause of the delay was the opinion rendered by the defendant Stephens — the only lawyer on the board of directors of Pan Am and the general counsel for Indiana — that the anti-trust laws of Texas made it illegal for a subsidiary of Pan Am to engage in oil production in Texas in view of the circumstance that Indiana, which owned a majority of Pan Am's stock, already had a wholly owned subsidiary — SO&G — engaged in oil production in that State. The defendant directors refused to assume the risk attendant upon putting Pan Am in the oil production business in Texas through a new subsidiary until the question of legality was resolved in favor of such a venture. That did not occur until 1935. In the meantime there were numerous conferences between various counsel upon the problem and opinions pro and con by eminent legal authorities. The suggestion by plaintiffs that the opinion by Stephens was crass subterfuge to provide an excuse for the refusal of Indiana to permit Pan Am to enter into the producing business was emphatically rejected by Special Term. Indeed, the Trial Justice stated '' I do not believe that Stephens was actually of a contrary legal opinion from the one actually written by him.'' However, that court ruled that although the defendant directors may have relied in good faith upon the legal opinion of Stephens, they had no right to rely upon it. Following the statement that '' Reliance was not compliance with their duties as directors of Pan Am, charged with the duty of looking out solely for the interests of Pan Am,'' the court concluded that '' it was their duty to seek outside counsel, and their failure to

do so makes them equally responsible with Indiana to account for the profits which Indiana made as a result of its conduct.'' One error which we find in that conclusion relates itself to undisputed evidence that during 1934 and 1935 advice upon the problem then ·confronting the defendant directors was repeatedly given by outside counsel. We find in the record substantial evidence which supports the findings of the Appellate Division that the defendant directors, in good faith, and in the honest exercise of their discretion, deferred until 1935 the organization of a Pan Am crude oil producing subsidiary to operate in Texas because of their honest belief that, in the circumstances, the Texas anti-trust laws made it unsafe, from a legal standpoint, for such a subsidiary to engage in the business of producing crude oil in Texas.

We come then to the question whether, during the period from April 1, 1933, to July 1, 1935,— when Pan Am had no subsidiary engaged in producing crude oil in Texas — Indiana, acting through the defendant directors, usurped profitable business opportunities which rightfully belonged to Pan Am. The rule which permits a court of equity to impress with a constructive trust property which is the product of an appropriation of a business opportunity by a corporation director or officer or a majority stockholder owing some form of fiduciary duty, is not satisfied by proof that after the property is appropriated it occurs that it would have been useful in the corporation's business. The lack in the present case is the essential proof that at the time the properties in question were acquired by SO&G they were recognized or identified as properties in which Pan Am had a tangible expectancy — a right which in its nature was inchoate. (*Lincoln Stores, Inc.*, v. *Grant,* 309 Mass. 417, 421–424; *Solimine* v. *Hollander,* 128 N. J. Eq. 228, 244–246; *Loft, Inc.,* v. *Guth,* 2 A [2d] 225, 239; *Colorado Co.* v. *Harris,* 97 Colo. 309, 310–312; cf. *Hauben* v. *Morris,* 255 App. Div. 35, affd. 281 N. Y. 652; *Seymour* v. *S. F. C. Assn. et al.,* 144 N. Y. 333, 344.)

If it be assumed that in the circumstances here involved a measure of fiduciary obligation was owing to Pan Am by the defendant directors and to the minority stockholders by Indiana as owner of a majority of Pan Am's stock (*Farmers L. & T. Co.*

*v. N. Y. & N. R. Co.*, 150 N. Y. 410, 430), we find no evidence of a breach of that obligation by either the defendant directors or by Indiana.

In that connection we refer first to the charge by the plaintiffs and the ruling by Special Term that Indiana, acting through the defendant directors, and its subsidiary SO&G, appropriated during the period from April 1, 1933, to July 1, 1935, certain business opportunities to which Pan Am was entitled. Upon this branch of the case the undisputed evidence shows that SO&G and its predecessor companies acquired properties in the East Texas and Gulf Coast fields in the course of the active exploration, experimentation and acquisition of oil lands inaugurated long before that date in 1933 when the plan was decided upon by Pan Am to build a refinery at Texas City. At a time more than thirteen years previously — in 1919 — the Dixie Company — one of SO&G's corporate predecessors, had been active in the exploration and development of oil bearing lands in Texas, Louisiana, Arkansas and Oklahoma. During the period from 1922–1930 the Dixie Company conducted exploratory work which gave sufficient promise to prompt the leasing of properties in fifteen counties in the Gulf Coast Area and the acquisition of an undivided half interest in a large nonproducing area in Oklahoma and Kansas. In November, 1932, SO&G, aided by geologists and counseled by other experts, undertook extensive seismographic work on the Gulf Coast and in the early part of 1933 it began experiments with a torsion balance — a type of geophysical work. As a result of these experiments and its continued active exploration SO&G leased property in six more counties, much of which was non-productive, only a portion of it being valuable. Among the valuable lands thus discovered was the Hastings oil field — one of the properties which Special Term directed should be turned over to Pan Am. This acreage — a prairie with no surface indications that oil deposits were beneath the ground — came to the attention of SO&G's production manager in December, 1933, as a result of the company's torsion balance experiments. Acquisitions in that area were accomplished without the knowledge of Indiana that SO&G had taken leases there. The areas in the East Texas field, in which are located the other crude oil properties which

Special Term dealt with in the interlocutory judgment, were discovered in 1931. During that year and in 1932, SO&G continued to acquire leases there. However, the properties upon which the interlocutory judgment impresses a trust were acquired late in 1933 and early in 1934. During the years of exploration and acquisition of oil lands SO&G spent in excess of $70,000,000 for the properties acquired, and in addition a vast sum for production, including $43,000,000 for exploration.

From the evidence mentioned above and from other evidence of record it appears that SO&G for years prior to 1933 and thereafter pursued as a consistent activity — appropriate to its own business and independent of Pan Am — a program of exploration for crude oil. In carrying out that program it purchased a vast acreage of land, much of which proved worthless and a portion yielded oil of great value. This exploration, although in its nature speculative, was legitimate business which, as a result of SO&G's initiative and by the use of its own funds — not funds of Pan Am — has in many instances yielded deposits of crude oil, which was the objective. The evidentiary history of the acquisition of oil lands by SO&G does not establish that any one of the properties acquired by it between April 1, 1933, and July 1, 1935, was on the date of acquisition identified as property in which Pan Am had a tangible expectancy. (*Lincoln Stores, Inc.*, v. *Grant, supra.*) We agree with the Appellate Division that the record contains no evidence which will serve as a legal basis for that portion of the interlocutory judgment which impresses with a constructive trust in favor of Pan Am certain crude oil properties acquired by SO&G.

We find no evidence which justifies the conclusion that Indiana so dominated the affairs of Pan Am and the official acts of the defendant directors as to impair the free exercise of honest, independent judgment by those directors. In those matters which related to crude oil production, to which reference has been made, and in meeting the difficult problems of crude oil purchasing and pipe line transportation which faced the Board of Directors of Pan Am in 1933, the arrangements made were in the exercise by the defendant directors of honest business judgment. There was no finding of fraud or bad faith on the part of the defendant directors in any of the transactions

with which Special Term dealt. The ruling by that court was that — "The individual directors defendants are being held liable not because they received any part of the profits themselves or because they took over for themselves any business opportunities of Pan Am but on the ground that they appropriated for Indiana the transactions and profits" to which the interlocutory judgment refers. We find no evidence which affords a legal basis for liability thus imposed. It is the plaintiffs' position that the directors in March, 1933, should have made arrangements by which Pan Am would own rather than lease from Indiana's subsidiary its pipe line transportation facilities; that Pan Am should have organized promptly a crude oil purchasing personnel rather than arrange for a crude oil purchase contract with an Indiana subsidiary. At that time the problems of crude oil purchasing and pipe line transportation were critical. The estimated cost of constructing a pipe line gathering system in the East Texas field with a trunk pipe line direct to the projected refinery at Texas City was in excess of $4,000,000. At that time a severe financial crisis was causing great uncertainty in the oil industry as to future commitments of any kind. Pan Am would require a continuous flow of 48,000 barrels of crude oil per day on January 1, 1934. The Definitive Agreement gave to Pan Am no contractual right to compel Indiana or its subsidiaries to supply all or any part of its crude oil requirements except, significantly, Indiana undertook to supply "to the extent of its ability and without loss to itself" all or any part of the deficiency in Pan Am's crude oil requirements "at average prevailing field prices." Indeed the Definitive Agreement contained no mandate so exacting as to dictate for Pan Am an inflexible corporate policy. The acts of the defendant directors " * * * within the powers of the corporation, in the lawful and legitimate furtherance of its purposes, in good faith and the exercise of an honest judgment, are valid and conclude the corporation and the stockholders. Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exer-

cise of them for the common and general interests of the corporation may not be questioned although the results show that what they did was unwise or inexpedient." (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113, 124.) The law requires of directors that they shall exercise in good faith that care which the problems confronting the corporation demand. To determine whether transactions approved by directors subject them to liability for a breach of duty we look to the facts which relate themselves to the problems involved as they exist at the time of their occurrence, not aided by those which occur subsequently. " A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello*, 209 N. Y. 252, 262.) We find no evidence that the contracts made for crude oil purchasing and pipe line transportation were unreasonable in price; nor is there evidence that under conditions then existing — when large capital expenditures were of doubtful expediency — the arrangements made to purchase crude oil and to transport it were not for the best interests of Pan Am. In that connection, as bearing particularly upon the reasonableness of the crude oil purchasing arrangements, we note a provision in the crude oil purchasing contract dated September 18, 1933, between Stanolind Crude Oil Purchasing Company (an Indiana subsidiary) and Pan Am, that the contract could be terminated by Pan Am whenever crude oil could be obtained by Pan Am at a cost lower than the Indiana subsidiary was willing to meet. In no instance does the evidence afford a legal basis for concluding that Indiana, acting through the defendant directors, usurped as business opportunities belonging to Pan Am any contract which made provision for crude oil purchase or pipe line transportation.

In the complaint herein the plaintiffs charged the defendant directors, the defendant Teagle and the corporate defendants Indiana, Standard Oil Company (N. J.) and Standard Oil Company of New Jersey (Del.) with having " in bad faith, fraudulently, wilfully and intentionally wasted the assets, profits and business opportunities belonging to and available to defendant Pan Am * * *." The plaintiffs' evidence was held by Special Term to be insufficient to establish fraud or bad faith by any defendant. In that court the complaint was dismissed on the merits against the defendant Teagle and the two Stand-

ard Oil Company defendants. We conclude, as did the Appellate Division, that as to the remaining defendants the evidence adduced is not sufficient in law to establish against them the liability decreed by the interlocutory judgment entered by Special Term.

Our decision should not be understood as approving the " conclusion of law " by the Appellate Division that certain subsidiaries of Indiana were " necessary parties defendant " in this action. Upon that subject we agree with the ruling at Special Term that " * * * equity frequently disregards corporate entities even where the subsidiaries are not mere instrumentalities of the parent." (*Rapid T. Subway Constr. Co.* v. *City of N. Y.* 259 N. Y. 472, 491; *Berkey* v. *Third Avenue Railway Co.*, 244 N. Y. 84, 95.)

The judgment dismissing the complaint on the merits should be affirmed, with costs.

LEHMAN, Ch. J. (dissenting). Indisputable evidence leads irresistibly to the conclusion that Standard Oil Company (Indiana), herein referred to as Indiana, dominated and controlled Pan American Petroleum & Transport Company, herein referred to as Pan Am, through directors elected by it as majority stockholders. That was implicit in all the discussions and negotiations between Indiana, Pan Am and the Blausteins which culminated in the " Definitive Agreement." All the parties so understood and they could not have supposed otherwise. Indiana had previously owned 96% of the stock of Pan Am and it is evident that it did not acquire that stock as an investment, but for the purpose of operating Pan Am in co-operation with other corporations which it controlled, if not, indeed, as part of a single system. When negotiations began with Blausteins for a " reorganization " of Pan Am, the officers of Indiana, not the officers of Pan Am, dominated the discussions and decided upon Pan Am's future. Indiana was itself a party to the " Definitive Agreement " and undertook that Pan Am would be managed in accordance with its terms. More than that, Indiana assumed on its own behalf financial obligations towards Blausteins which would have been unfair to its own stockholders if Indiana had not controlled the policies of Pan Am. Instinct in every line of the agreement and in all that was said and done is the underlying assump-

tion that Indiana would control and dominate the majority directors to be elected by it and Blausteins would control and dominate the directors elected by them. The undisputed evidence indicates unmistakably that Indiana and the Blausteins thereafter exercised control and domination as the parties had expected. Indiana elected as directors of Pan Am men who were officers or directors of Indiana or of subsidiary corporations of Indiana, and in important matters the policies of Pan Am were decided by Indiana.

Blausteins and other minority stockholders cannot complain that Indiana dominated and controlled Pan Am; but, because Indiana did exercise domination and control through the directors it elected, Indiana became subject to the same fiduciary obligation which a director assumes towards the corporation and its stockholders. Pan Am and its minority stockholders may complain if Indiana exercised its control for its own benefit and without honest desire to promote the interests of Pan Am. The serious question presented upon this appeal is whether the evidence establishes dereliction in that respect on the part of Indiana.

The Trial Justice who saw and heard the witnesses found that the evidence established that Indiana and the directors elected by it were derelict in some instances. The Appellate Division reversed these findings and the majority of this court agrees with the Appellate Division. It seems to me that for the most part the weight of evidence sustains the findings of the Trial Justice. Whenever there was conflict of opinion between the directors controlled by Indiana and the directors controlled by Blausteins, the directors controlled by Indiana voted for delay, and always Indiana and its subsidiaries profited by the delay. That consideration is not decisive, but in my opinion it gives strong support to the findings and conclusions of the Trial Justice. Nevertheless, where the evidence is conflicting and there is room for difference of opinion I would probably not dissent from a determination by this court that the weight of evidence lies with the contrary conclusions of the Appellate Division.

Even so, upon the undisputed evidence and conceded facts, I think that the plaintiffs have established their right to a decree that Indiana holds as constructive trustee for Pan Am all prop-

erties in the East Texas field which were purchased by Indiana, or its subsidiaries, after Pan Am was " reorganized " and which were thereafter used to supply oil to the refining plant of Pan Am. I assume here that the decision of Indiana, or the directors of Pan Am, to delay the organization of a subsidiary of Pan Am for oil production in Texas and to delay the purchase of oil wells in Texas was due to honest and reasonable doubt as to the legality under the Texas anti-trust laws of proposed corporate action to carry out in that respect the plan to make Pan Am a fully integrated oil company. The fact remains that all the directors agreed that Pan Am should proceed to acquire and operate oil properties in Texas if upon further consideration it appeared that production of oil by Pan Am would be lawful. The question of law was submitted to Texas counsel and while corporate action by Pan Am was held in abeyance Indiana through its subsidiaries purchased oil wells intended to be used and which have been used to supply to Pan Am oil required by its great refining plants. Thereafter all the directors agreed that Pan Am, or a subsidiary, could legally buy and operate oil wells in Texas. Its opportunity to buy was limited to oil properties which Indiana had not thus acquired in the interval.

This is not a case where proof is made that *after* the properties were acquired by Indiana it appeared that the properties would have been useful in the business of Pan Am. The proof establishes conclusively that *when* Indiana acquired the properties it knew that they would be useful if not indispensable in the business of Pan Am and that Pan Am could not acquire the properties at that time because its directors, controlled by Indiana, had not yet determined whether Pan Am could legally buy them. I agree, almost wholly, with the general rules of law set forth in the majority opinion. Our difference of opinion concerns the application of these rules to the facts in the case. In my opinion the plaintiffs have proven conclusively that under the general rules formulated in the majority opinion and the cases cited in support of these rules, Indiana has usurped some profitable business opportunities which rightfully belonged to Pan Am, and the plaintiffs have established by the weight of evidence a right to relief in other instances though, perhaps, not to the full extent awarded them at Special Term.

The judgment of the Appellate Division should be reversed.

LOUGHRAN, CONWAY and DESMOND, JJ., concur with LEWIS, J.; LEHMAN, Ch. J., dissents in opinion in which RIPPEY, J., concurs; THACHER, J., taking no part.

Judgment affirmed, etc.   (See 293 N. Y. 763.)