**In re BARLUM REALTY CO.**

No. 30296.

District Court, E. D. Michigan, S. D.

May 23, 1945.

James E. Littell, of Detroit, Mich., for Trustee National Bank of Detroit.

C. J. Odenweller, Jr., of Cleveland, Ohio, for Securities and Exchange Commission.

Thomas G. Long, of Detroit, Mich., for Indenture Trustee and Consolidated Committee.

Harold M. Shapero, of Detroit, Mich., in pro. per. and for certain bondholders.

Philip D. Dexter, of Detroit, Mich., for Margaret M. Wardell, attorney for petitioning creditors.

Karbel & Eiges, by Sidney J. Karbel, all of Detroit, Mich., for Barlum Realty Co., debtor, William R. Wilson, sole stockholder and large general creditor, and Mary H. Wilson, a bondholder.

Schmier & Schmier, by Herman A. Schmier, all of Detroit, Mich., for Barlum Realty Co., debtor, William R. Wilson, sole stockholder and large general creditor, and Mary H. Wilson, a bondholder.

Ralph E. Routier, of Detroit, Mich., for certain bondholders.

MOINET, District Judge.

This matter comes before the Court for the consideration of the approval of two plans of reorganization, one filed by the Trustee, and the second filed by Harold M. Shapero, a bondholder, in a proceeding for the reorganization of the debtor under Chapter X of the Bankruptcy Act as amended, 11 U.S.C.A. § 501 et seq. On August 17, 1943, an involuntary petition was filed for the reorganization of the debtor, which was approved as properly filed on December 14, 1943, and the National

Bank of Detroit was on the same day appointed Trustee. Said Trustee qualified as such and, after an investigation into the affairs of the debtor filed its plan of reorganization on February 5, 1945.

At the request of the Court, the Securities and Exchange Commission filed its notice of appearance herein on October 19, 1943, and since that date has actively participated in the proceedings.

The debtor is a Michigan corporation organized July 21, 1914, and its charter renewed July 14, 1944. Its principal business and sole asset is the owning and operating of the Barlum Tower, a 40-story office building located on the northwest corner of Cadillac Square and Bates Street in Detroit, Michigan. The building was constructed in 1927 and is subject to the lien of a trust mortgage dated June 15, 1928, securing First Mortgage Bonds of the debtor originally issued in the amount of $3,600,000.

In July of 1932 the Equitable Trust Company in its capacity as successor Indenture Trustee, having previously accelerated the maturity date of the bonds, instituted a foreclosure action in the Circuit Court of the County of Wayne, Michigan. A foreclosure decree was entered on June 30, 1939. This decree permitted the Indenture Trustee to bid the property in at a foreclosure sale and to pay therefor by crediting the bid amount against the amount then due under the decree. From a sale pursuant to said decree an appeal was taken to the Supreme Court of the State of Michigan and by decision rendered June 19, 1940, Equitable Trust Co. v. Barlum, 294 Mich. 167, 292 N.W. 691, 130 A.L.R. 1343, the trial court's decree of foreclosure relative to bidding in the property was reversed. No further action was taken in the foreclosure proceeding after said decision.

The debtor and the Indenture Trustee, in lieu of the appointment of a receiver or the taking possession by the Trustee pursuant to the terms of the Trust Mortgage, entered into a certain written agreement dated December 30, 1929, which said agreement was supplemented on October 1, 1931, and on March 10, 1932, whereby the debtor waived the provisions of Act 228 of Public Acts of the State of Michigan, 1925 and agreed to collect the rents and to apply them for the benefit of the First Mortgage Bondholders, the Indenture Trustee to exercise supervision over the operation of the building and the accounting in relationship thereto, with the power to countersign all checks and other payments.

At the time of the institution of the present proceeding, First Mortgage Bonds of the debtor were outstanding in the principal sum of $3,592,000, of which the debtor held in its treasury bonds in the principal amount of $10,000. Pursuant to an order entered May 1, 1944, a payment of 10 per cent upon principal was made by the Trustee, thereby reducing the unpaid principal to $3,232,800. In addition, there had accrued as of December 31, 1944, interest at the rate of 6 per cent per annum, with interest on unpaid coupons, aggregating $4,420,645.49. All current taxes have been paid and there are only a few thousand dollars of preferred claims. General claims aggregate $236,000. There are outstanding 1,200 shares of common stock with a par value of $100 per share, all of which are owned by William R. Wilson, president of the debtor and the manager of the building.

It is well recognized that going concern values of assets of companies in reorganization require a prediction of their future earning capacity, which must of necessity be estimated as distinguished from mathematical certitude. The opinion should be based on a well-informed judgment embracing all facts bearing upon the future earning capacity of the debtor, including the physical condition of the property, its rentability, its earning record, and any other material circumstances which would bear upon its future earning capacity. The necessity of determining going concern value was recognized in Re Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. The court there said (312 U.S. at page 525, 61 S.Ct. at page 685, 85 L.Ed. 982): "Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization. Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a sine qua non to a determination of the integrity and practicability of the new capital structure."

At the hearings on the plans held pursuant to Section 269 of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 669, considerable testimony was taken as to the going concern value of the property. Mr.

James E. Atkinson was called to testify by the Trustee, and Mr. Sidney M. Schott was called by Mr. Shapero. There was considerable difference in the view of these two appraisers as to the going concern value of the property. Mr. Atkinson was of the opinion that the value of the building was $1,155,000. Mr. Schott, on the other hand, was of the opinion that it was worth $2,932,000. Both men arrived at their conclusions through capitalization of earnings. Mr. Atkinson arrived at his future earning figure by taking an average of the past 15 years, whereas Mr. Schott multiplied the number of square feet available for occupancy by a rate of $1.60 per square foot and then made an allowance of only 15 per cent for vacancies, which resulted in a gross income per square foot of total rentable area higher than the building has ever experienced. Mr. Atkinson capitalized average earnings of $92,000 per year, while Mr. Schott used average earnings of $197,000 per annum, both of which are computed before depreciation and Federal income taxes.

Mr. Atkinson's approach and method seem to this Court to have been sound and his estimate of the future to be justified, while Mr. Schott's approach is unwarranted in that he admittedly gave no consideration to past performances, relied entirely upon the current record, and was unduly optimistic of the future. Schott's forecast of the future painted an occupancy and earning record for this building never approached in its last fifteen years of operation. Further, Schott appears to have been influenced to too great a degree by the abnormal earnings which the building is enjoying during this war period. War earnings are not a reliable criterion for the determination of the going concern value of a debtor, since "the bulge of war earnings per se is unreliable for use as a norm unless history is to be ignored." Group of Institutional Investors and Mutual Savings Bank Group v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 318 U.S. 523, 63 S.Ct. 727, 739, 87 L.Ed. 959.

Mr. Atkinson capitalized his earnings at 8 per cent, because of the location of the building, and Mr. Schott used a 7 per cent rate. The testimony reflected that the building cost only $2,465,492.78. It is the opinion of the Court that Mr. Atkinson's appraisal is sounder and more nearly represents the true going concern value of the assets of the debtor. I, therefore, conclude that the debtor is insolvent.

Turning now to the plans of reorganization before the Court, the Trustee's plan contemplates the creation of a new corporation to which all of the assets of the debtor will be conveyed. The capital structure of the reorganized company to consist of $716,400 of 20-year First Mortgage Sinking Fund Bonds bearing 5% interest per annum, 3% of which shall be fixed, and 2% payable if earned. Monthly deposits to be made with the Indenture Trustee for tax payments, additional interest, and retirement of bonds. The reorganized company to be authorized to issue 179,100 shares of common stock with a par value of $2.50 per share. The old First Mortgage Bondholders under the Trustee's plan would receive in exchange for each old bond having a face value of $100 (which was reduced to $90 by the 10 per cent payment on principal), a new First Mortgage Bond with a face value of $20, plus 5 shares of the common stock, and cash to the nearest one quarter of one per cent of the face amount of the old securities, after the Trustee has paid all cash items, administrative costs and provided the reorganized company with adequate working capital. Other than the payment of such preferred creditors whose claims may be allowed, all other creditors and stockholders of the debtor are not to participate in the Trustee's plan.

Mr. Shapero's plan provides for the supplementing of the present Mortgage Indenture, which would cancel all past due interest and extend the entire principal amount for a period of 30 years, the bonds as extended to bear interest at the rate of 3% per annum, payable if earned, interest to be payable from net earnings which is to be computed by deducting from gross income all taxes, expenses and depreciation. The depreciation funds not used for maintenance to be distributed on principal. The charter of the debtor to be amended to authorize 32,228 shares of no par common stock, which is to be distributed to the bondholders at the rate of one share for each $100 principal amount old bonds. Similar to the Trustee's plan only bondholders and preferred creditors are to participate.

The only substantial objection filed to the Trustee's plan was filed by the debtor and the owner of all of the outstanding stock

of the debtor, on the grounds that: First, the petition was not filed in good faith; second, the proceeding was instituted for the purpose of indirectly acquiring the property of the debtor for the bondholders; third, the plan makes no provision for stockholders or general creditors in the moneys sequestrated by the agreement between the debtor and the Indenture Trustee for the collection of the rents and fails to credit them with a value for the debtor's equity of redemption; and, fourth, the proceeding is for the liquidation of the debtor.

■ There is no merit to the first contention of the objector that this proceeding was not instituted in good faith. The purpose for which this proceeding was instituted was to readjust the rights of creditors and the plans filed with this Court carry out such a purpose. The order of December 14, 1943, found that the petition had been filed in good faith, from which no appeal was ever taken. Good faith cannot at this late date be collaterally attacked because. when the order approving the petition has become final it is a conclusive determination of the jurisdiction of the Court. Bankruptcy Act, Section 149, 11 U.S.C.A. § 549. See Country Life Apartments, Inc., v. Buckley, 2 Cir., 145 F.2d 935, 938.

■ The second contention is equally unmeritorious. Neither of the plans filed contemplate the sale and liquidation of the assets of the debtor. Both contemplate merely the readjustment of the rights of the creditors and stockholders in accordance with applicable law. It was for the purpose of avoiding the archaic procedure of foreclosure of mortgages which led Congress to extend the powers of the bankruptcy court over corporate reorganizations. The fact that the Indenture Trustee could not complete its reorganization proceedings in the Wayne County Court is no grounds for contending here that the Court has no power to do in effect what the Indenture Trustee was unable to do in the other proceeding.

■ Moreover, Chapter X contemplates that a debtor may be reorganized through a plan of reorganization which provides for the "sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein." Sec. 216(10) of the Bankruptcy Act, 11 U.S.C.A. § 616(10). This procedure "is amply supported by * * * decisions [of the] courts." Country Life Apartments, Inc., v. Buckley, supra. If outright liquidation is permitted then, a fortiorari, a plan which contemplates merely a recapitalization and redistribution of securities is within the contemplation of Chapter X of the Bankruptcy Act.

The third objection attacks the Trustee's plan of reorganization as being unfair in its treatment of general creditors and stockholders. The Trust Mortgage which secures the bonds conveyed the land and the building thereon and assigned and transferred to the Indenture Trustee the rents, issues and profits therefrom. This indenture was recorded not only as a real estate mortgage but also as a chattel mortgage, which latter mortgage has been rerecorded regularly pursuant to the laws of the State of Michigan. Thus, all of the assets of the debtor were pledged to secure the outstanding bonds.

■ General creditors and stockholders may share in the pledged assets in a plan of reorganization only after the bondholders have been given full compensatory treatment. This doctrine was recognized in the case of Consolidated Rock Products Co. v. Du Bois, supra. There the Court stated (312 U.S. at page 529, 61 S.Ct. at page 686, 85 L.Ed. 982): "If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of the stockholders without compensation. That is not permissible. The plan then comes within judicial denunciation because it does not recognize the creditors' 'equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation.' Kansas City Terminal R. Co. v. Central Union Trust Co., supra 271 U.S. [445], at page 454, 46 S.Ct. [549], 70 L.Ed. 1028."

■ The words "fair and equitable" are words of art and have acquired a fixed meaning through judicial interpretations in the field of corporate reorganization. A plan of reorganization to be "fair and equitable" must accord to the creditors—first of secured, then of unsecured—prior rights in the property of the debtor before stockholders are entitled to any participation. Any attempt by which sub-

ordinated rights or interests are secured at the expense of prior rights comes within judicial denunciation. Louisville Trust Company v. Louisville, New Albany & Chicago R. Co., 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130; Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. Du Bois, supra.

■ The Trust Mortgage assigned all of the rents, issues and profits flowing from the mortgaged property. After default, by written agreements aforementioned, the debtor collected the income subject to said agreements, which in effect sequestrated the rents for the bondholders. The debtor, in addition, waived the requirements of Act 228 of Public Acts of the State of Michigan 1925. The sequestration of the rents for the bondholders in this manner was not defective through a failure of the Mortgage Trustee to record a notice pursuant to said Act. See Detroit Trust Co. v. Detroit City Service Co., 262 Mich. 14, 247 N.W. 76, and Giblin v. Detroit Trust Co., 270 Mich. 293, 258 N.W. 635. The distribution was proper since the bondholders were the cestuis que trusts of the fund. The funds which were turned over to the Court's Trustee were subsequently ordered disbursed to the bondholders upon the principal of their bonds. It being their money, it must follow that there was therefore no appropriation of a "free asset" in which general creditors had an interest.

■ Chapter X of the Bankruptcy Act as amended gives the bankruptcy court exclusive jurisdiction over the debtor and its assets. Section III of Bankruptcy Act. It is contended by the objector that this Court should have determined the value of the equity of redemption of the debtor and provided in the plan for creditor and stockholder participation to the extent of the amount so determined. The objector is confusing a procedure in straight bankruptcy (Chapters I to VII of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq.) with the procedures outlined in Chapter X of the Bankruptcy Act. The bankruptcy court, under Chapter X, has jurisdiction to readjust the rights not only of the unsecured creditors but also the secured creditors of the debtor, and "may deal with all or any part of the property of the debtor." Sec. 216(2) of bankruptcy Act. No rights of the debtor or of the general unsecured creditors are thereby violated if the secured creditors are permitted to take over the assets of the debtor pledged for their obligation, free and clear of any equity of redemption.

■ The Trustee's plan and Mr. Shapero's plan in providing that the general unsecured creditors and stockholders are to receive no participation in the plans of reorganization are both "fair and equitable" since the claims of the debtor's bondholders exceed the going concern value of the enterprise tested by either appraiser's opinion. Case v. Los Angeles Lumber Products Co., Ltd., supra.

■ The Court must, in addition to finding the plan "fair and equitable," also find the plan of reorganization to be "feasible." Feasibility means that the reorganized company will emerge in a solvent condition with reasonable prospects of financial stability and success. Some of the factors to be considered in this determination involve the soundness of the proposed capital structure and the ability of the reorganized company to meet its financial obligations at their maturity dates. It is, therefore, necessary that the proposed capital structure of the reorganized company bear some reasonable relationship to its going concern value and its requirements to its expected source of income. A determination that the proposed capital structure is sound when tested by its earning capacity "can give the new company some safeguards against the scourge of overcapitalization." Group of Institutional Investors and Mutual Savings Bank Group v. Chicago, Milwaukee, St. Paul & Pacific R. Co., supra. See also Consolidated Rock Products Co. v. Du Bois, supra.

It is unsound for a reorganized company to be launched forth with a capital structure in which the aggregate amount of debt exceeds the going concern value of the assets. "The same standards of sound finance are applicable to real estate companies as to other business enterprises. Failure to restrict debt to proper limits with reference to earning power has been a principal cause of widespread defaults on real estate mortgages." Advisory Report of Securities and Exchange Commission, In the Matter of Broadway-Exchange Corporation, Debtor.

■ The Trustee's plan proposes a new bond issue of $716,400, which is 62% of Mr. Atkinson's going concern value of $1,155,000. The Shapero plan contemplates

a bonded indebtedness of $3,232,800, which would be 280% of said going concern value. Even under the most favorable appraisal figures given by Mr. Schott, the ratio of debt to going concern value in the Shapero plan would be 110%. In my opinion, the securities proposed by Mr. Shapero are unsound and somewhat deceptive, since it is obvious that they could not be worth what they purport to be on their face.

The fact that an office building has a limited economic life emphasizes the need of debt retirement even more than in the case of an industrial enterprise. Industrial enterprises provide depreciation reserves for the replacement of capital assets upon obsolescence or upon wearing out. These reserves are available for new plants and equipment, they permit the enterprise to maintain pace with industrial development in its field and in meeting competition with the result that its life may be prolonged indefinitely. In the operation of an office building, such opportunities are few. Old and wornout equipment can, of course, be replaced, but obsolescence is difficult to remedy. A building that no longer attracts tenants because there has been a shift to other neighborhoods, or because it is old or outdated, can secure only small assistance in arresting the inevitable loss of income. It, therefore, seems that it is an absolute necessity for sufficient earnings to be set aside so that the reorganized company's debt can be very substantially reduced, if not entirely paid off, as the end of the economic life of the building approaches.

In the opinion of this Court, the Trustee's plan does just that. I believe the evidence indicates that the proposed bond issue will be paid off within twenty years; that it is not reasonably to be expected that another default will occur repeating the fiasco of this issue and precipitating this company back into the lap of this or some other court, an occurrence which all too often has happened in corporate reorganization proceedings. However, the proposed debt which is contemplated in the Shapero plan, namely, $3,232,800, would not be retired or reduced to a refundable amount within the thirty year extended period through the application of the reasonably foreseeable earnings. There still would be approximately $1,300,000 in principal amount of bonds outstanding at the end of that thirty-year period. This means that as the building approached the end of its economic life, it would still owe more in the way of a bonded debt than this Court has found its going concern value to be today, when it is only seventeen years old and in times which admittedly are abnormal.

Also during this period, it is questionable whether the extended bonds would receive interest at a rate much in excess of 1% notwithstanding an innuendo that they are 3% bonds. This is due to depreciation being deducted in the computation of "earnings" from which interest is to be paid.

Since securities issued pursuant to a plan or reorganization under Chapter X are exempt from the registration requirements of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. (Section 264a(2) of the Bankruptcy Act, 11 U.S.C.A. § 664a(2), there is a certain burden thrust on the Court to carefully scrutinize the proposed new securities and to reject any plan of reorganization which proposes to issue securities of an unsound type. This requirement was recognized in the case of In re American Department Stores Corporation, D.C., 16 F.Supp. 977. That Judge stated (16 F.Supp. at pages 979, 980): "It is the duty of the court to pass upon the feasibility of the plan of reorganization. Although the plan were unopposed, the court should not approve any feature fundamentally unsound. * * * Congress in subdivision (h) of section 77B, 11 U.S.C.A. § 207(h) provided that: 'All securities issued pursuant to any plan of reorganization confirmed by the court in accordance with the provisions of this section, * * * shall be exempt from all the provisions of the Securities Act.' This imposes upon the courts the task of scrutinizing with care securities to be issued under a plan of reorganization." This responsibility is solely that of the Court, notwithstanding the fact that a representative of the Securities and Exchange Commission may be participating in the proceeding pursuant to Section 208 of the Bankruptcy Act, 11 U.S.C.A. § 608, since such participation is limited to that of "a party in interest, with a right to be heard on all matters arising in such proceeding."

Likewise, the fact that a large majority of the bondholders have indicated a preference for a particular plan is not the test of whether the plan is fair and equitable and feasible. To hold otherwise

would make a judicial determination on these issues a mere formality and would effectively destroy the function and duty imposed by Congress on the district courts under Chapter X of the Bankruptcy Act. Every important determination calls for an informed independent judgment. Case v. Los Angeles Lumber Products Co., Ltd., supra.

It has been strenuously urged by Mr. Shapero in support of his plan that tremendous tax savings inure to the bondholders by reason thereof. It is impossible to determine whether the present high income tax rates will be continued by Congress against corporations. Mr. Shapero predicated his contention upon the continuation of the present high rates, which may or may not be a correct supposition, and to the extent that it is incorrect the actual savings would be reduced to that extent.

In addition to the fact that it is probably not appropriate to speculate as to the nature and extent of the tax statutes over the life of the reorganized debtor, even if the fact that tax saving could be shown, it should not outweigh the necessity for a sound capital structure within the limits of feasibility. Judge Goddard, District Judge for the United States District Court in the Southern District of New York, in his unreported decision of July 10, 1941, in a case of In re Ulen & Co., CCH Bankruptcy Law Service, par. 53,523, a corporate reorganization under Chapter X, recognized the necessity for sound securities and that tax considerations should not outweigh these fundamental necessities. He stated in his memorandum decision: "Judicial approval of such an issue, it should be noted, would tend to lead members of the public to the erroneous belief that the Court concluded that the securities were sound and that the reorganized company would be able to pay the principal and accumulated interest at maturity. Such is not my conclusion. Nor is this view expressed in the advisory report of the Securities and Exchange Commission, with whose recommendations I agree. The possibility of some savings in taxes is outweighed by these considerations." This view is continually enunciated in the advisory reports of the Securities and Exchange Commission. See Advisory Report of Securities and Exchange Commission, In the Matter of Broadway-Exchange Corporation, Debtor; In the Matter of Cenwest Corp., Debtor; In the Matter of Indiana Limestone Corporation, Debtor.

It is, therefore, my conclusion that while both the plan of the Trustee and the plan of Mr. Shapero are "fair and equitable," only the plan of the Trustee is "feasible," and therefore the plan of the Trustee alone is "worthy of consideration." Section 172 of the Bankruptcy Act, 11 U.S.C.A. § 572. The Securities and Exchange Commission having notified me that it does not oppose approval of the Trustee's Plan and will not file an advisory report in this proceeding, I am therefore approving the plan of the Trustee, which in my opinion complies with the provisions of Section 216 of the Bankruptcy Act and is fair and equitable and feasible. Mr. Shapero's plan is not found worthy of consideration and is therefore disapproved.

Present order in accordance with above decision.